IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2015 at Knoxville

## STATE OF TENNESSEE v. THEODORE LEBRON JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-428     Monte Watkins, Judge**

---

**No. M2014-02046-CCA-R3-CD – Filed October 14, 2015**

---

The defendant, Theodore Lebron Johnson, appeals his Davidson County Criminal Court jury conviction of aggravated robbery, claiming that the evidence is insufficient to support the conviction and that the trial court erred by declining to instruct the jury regarding the loss or destruction of evidence. We discern no flaw in the conviction and affirm the trial court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Richard C. Strong, Nashville, Tennessee (on appeal); and Daphne Davis, Nashville, Tennessee (at trial), for the appellant, Theodore Lebron Johnson.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Deborah Housel and Nathan McGregor, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The jury convicted the defendant of the April 27, 2011 aggravated robbery of Gregg P. Hanson, the victim. The trial court sentenced the defendant as a career offender to serve 30 years in the penitentiary and overruled the defendant's timely motion for new trial. The defendant then filed a timely notice of appeal.

At trial, the victim testified that in 2011 he managed a Precision Tune Auto Care center on Gallatin Pike in Davidson County. A week prior to the robbery, the defendant came into the store just before closing and said he was waiting on his girlfriend

to bring in her car for an oil change. On this occasion, the defendant wore a white hardhat and a reflective vest. The store was busy with customers at that time; at some point, the defendant left the store. On April 27, 2011, the defendant came into the store again and told the victim that he was waiting on his girlfriend to bring in her car for an oil change. The defendant sat in a chair in the store lobby. After the sole remaining customer left the store and as the victim was speaking on the telephone, the defendant grabbed the phone and placed a gun against the victim's abdomen. The victim testified that the defendant walked him to the cash register and said, "'Put the money – open the register and put the money on the counter.'" The victim testified that he was scared and that he complied. The defendant "scooped . . . up" the money, $380, and then told the victim to open the safe. Again, the victim complied, and when the defendant saw the safe was empty, he left, leaving behind a black "beanie" cap. The victim locked the doors and called the police. The victim said that the defendant "very much" put him in fear.

When the police came, the victim described the robber as a six-foot male, slender, "fit and clean cut," "[l]ight dark," with a bald head. The defendant wore dark clothing including a black "hoodie." The victim pointed out the chair the defendant had used and the telephone as possible sites for obtaining fingerprints. The victim testified that in May 2011 he viewed various photographic arrays presented to him by the police. In one array, he recognized a customer of Precision Tune, John Newell, who drove a silver Pontiac automobile. From a photographic array presented to him a few days later, he identified the defendant as the man who robbed him.

On cross-examination, the victim said that police officers dusted for fingerprints inside the store and that they took the beanie cap with them.

Patricia Young testified that she lived on Curtwood Boulevard, that Curtwood intersects with Gallatin Road, and that the Precision Tune store sits in a corner of the intersection. She was on her front porch on April 27, 2011, when she saw "a black male, who wearing [sic], kind of, like a bubble jacket, and his hand, like, inside his jacket, . . . running down our street . . . from Gallatin Road." She said that the man got into a silver Pontiac that then left hurriedly, headed away from Gallatin Road.

On cross-examination, Ms. Young testified that a "bubble jacket" is not a "hoodie." Ms. Young did not see the face of the man wearing the bubble jacket.

Metropolitan Nashville Police Department ("Metro") Officer Nate Ward testified that in 2011 he was assigned to the Crime Scene Unit. He was called to the Precision Tune store on Gallatin Road late in the afternoon on April 27, 2011. "[A] black stocking cap on the floor" was pointed out to Officer Ward as something the robber had left behind. The officer collected the cap, placed it in a sealed bag, and gave it to the

"property section." He identified the bag containing the cap in court. He said the cap had been tested at the Tennessee Bureau of Investigation ("TBI") crime laboratory.

Officer Ward also dusted for fingerprints at the Precision Tune store. He dusted "at the point of entry" and a chair "that the victim pointed out where the suspect was sitting for a time."

On cross-examination, Officer Ward acknowledged that the prints he obtained from the entry door were not useable and that prints obtained from the underside of the armrest of the chair in which the robber sat were useable but did not match the defendant's fingerprints.

Metro Investigator Lynette Mace testified that she was assigned to the department's "ID Unit" in April 2011. On May 3, 2011, she was called to go to the Precision Tune store on Gallatin Road to retrieve "a piece of telephone that had come apart from the business phone during a struggle with the defendant." The piece was the battery cover off a wireless telephone. She testified that she lifted no prints from this object. She left the object at the store.

Metro Detective Michael Windsor testified that he spoke with the victim of the Precision Tune robbery and with Patricia Young. Based upon descriptions provided by them, Detective Windsor organized photographic arrays. The detective said that the victim recognized John Newell in one of the first arrays shown to the victim, and the detective was able to discern a connection between Mr. Newell and the defendant. The detective included the defendant's picture in an array later shown to the victim, and the victim identified him as the robber. At some point, the police searched Mr. Newell's silver Pontiac and found a white hat and a reflective vest.

The detective testified that, although deoxyribonucleic acid ("DNA") was found on the black beanie cap, it was too degraded to compare to any known DNA, such as the defendant's. Testing for DNA comparison on the hardhat and the reflective vest yielded the same result, except that the TBI laboratory was "able to get an allele." He said that, although 26 "alleles" were needed to form a complete DNA profile, the one allele found on the reflective vest was adequate to exclude the defendant as the contributor.

On cross-examination, Detective Windsor testified that the TBI received the black beanie cap for testing on February 7, 2014. The TBI issued its report on March 13, 2014.

The State rested its case, and following a *Momon* hearing, *see Momon v.*

*State*, 18 S.W.3d 152, 161-62 (Tenn.1999), the defendant elected not to testify. The defendant moved the court to instruct the jury regarding the State's duty to preserve the DNA evidence. Defense counsel specifically proposed the use of pattern jury instruction 42.23. Upon review, the trial court declined to give the instruction.

In his first issue, the defendant challenges the sufficiency of the evidence convicting him of aggravated robbery.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

In the present case, the defendant argues that the State failed to establish beyond a reasonable doubt that he was the person who robbed the victim on April 27, 2011. He points out that only the victim claimed to have identified the defendant, and Ms. Young's description of the robber's clothing "radically" differed from the victim's description. The defendant also stresses that a reflective vest and white hardhat were found in Mr. Newell's car and that the defendant's DNA was not found on these items.

In our legal system, however, a trial by jury is the crucible in which conflicting claims of fact are boiled down to dregs of truth. As pointed out above, when

the State presents sufficient evidence that the accused is guilty beyond a reasonable doubt, an appellate court is obliged to affirm the conviction despite the emergence at trial of conflicting or counter-weighing evidence. Here, the State presented the victim who testified to the elements of aggravated robbery and who identified the defendant as the person who committed it. That testimony alone satisfies the burden of proof, and assuming that the trier of fact believed this testimony, the presentation of conflicting evidence has no bearing upon appellate review. Accordingly, we hold that the evidence in this case sufficiently supports the verdict.

In his other issue, the defendant claims that the trial court erred by declining to give to the jury Tennessee Pattern Jury Instruction 42.23. He argues that, after collecting items of evidentiary value, the State waited three years before seeking DNA analysis and that the DNA itself was destroyed in the interim, resulting in a finding that the genetic material found on the items was too degraded for use.

Tennessee Pattern Jury Instruction 42.23 provides as follows:

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 42.23 (16th ed.).

The pattern jury instruction regarding the State's duty to preserve evidence had its genesis in principles of due process as espoused in *State v. Ferguson*. In that case, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (1999)). The court rejected a "bad faith" analysis in favor of "a balancing approach in which bad faith

is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure

"(1) [t]he degree of negligence involved;

(2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

In the present case, the defendant asserts that he should have had the benefit of pattern jury instruction 42.23. The gravamen of the defendant's *Ferguson* claim is that "if the State had tested the evidence sooner, it could have definitely been shown that his DNA was not present on the items." We hold that the trial court did not err by declining to give the instruction.

The evidence showed that the scant amount of genetic material on the vest

or hardhat was sufficient to exclude the defendant as a contributor. Thus, the expert testimony showed that only the beanie cap contained genetic material too degraded to analyze. Several factors undercut the defendant's claim to a due process remedy for the State's not testing the cap sooner. First, the relationship of the cap to the perpetrator of the robbery is dubious; although the cap was "left behind" after the perpetrator left the store, no one testified that the perpetrator wore the cap. Second, the DNA testing performed by the TBI did not result in a finding that the defendant's DNA was found on the cap; due to the degraded nature of the material, the result was, in effect, neutral. Third, even an affirmative determination that the defendant's genetic material was not on the cap barely advances the defendant's case; such a determination would only deny the State an additional inference of fact which, as pointed out above, it was denied anyway. Finally, the defendant did not cite authority that imposes a duty on the State to have ever performed the DNA analysis. The cap itself was neither lost nor destroyed, and we point out that, upon the defendant's request, the State was obliged to allow him "to inspect and copy or photograph . . . tangible objects . . ., if the item is within the state's possession, custody, or control and . . . the item was obtained from or belongs to the defendant." Tenn. R. Crim. P. 16 (a)(1)(F)(iii). In addition to inspecting the object, the defendant could have applied to the trial court for leave to conduct an independent analysis. *See id.* 16(d)(1) ("At any time, for good cause shown, the court may deny, restrict, or defer discovery or inspection, or grant other appropriate relief.").

At bottom, even if we assumed for the sake of argument that the State had a duty to preserve any genetic material that existed on its collected items of evidence, the significance of the destroyed evidence is slight, paling in comparison to the "other evidence used at trial to support the conviction." *See Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). Thus, the trial court did not err by denying a due process remedy in the form of a jury instruction.

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE